# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

02 JAN 25 AM 9:05

RICHARD L.S. JENNELLE,      )
       )
   Plaintiff,        )
       )
   v.        )     CV 01-BU-1141-S
       )
BIRMINGHAM        )
CONTEMPORARY DESIGN        )
CENTER, INC. et al.,        )
       )
   Defendants.        )
       )
       )

**ENTERED**

JAN 2 5 2002

---

## MEMORANDUM OPINION

---

Dr. Richard L.S. Jennelle filed this action against Defendants Birmingham Contemporary Design Center, Inc., ("BCDC"), Randi D. Gillinson, and Edward F. Goldfluss), seeking rescission of his investment in the Defendants' business venture. See Doc. No. 1. Plaintiff alleges that Defendants violated Section 5 of the Securities Act of 1933 ("the Act"), which requires issuers of securities to register their securities with the Securities and Exchange Commission (the "SEC") before selling or offering to sell such securities.[1]

---

[1] In the Plaintiff's complaint and briefs submitted to this Court, the Plaintiff labors under the incorrect notion that Section 5 of the Securities Act of 1933 15 U.S.C. provides a private cause of action for rescission of Plaintiff's investment. See Docs. Nos. 1, 14, 15, 18. Section 12(a)(1) of the Act provides that any person who offers or sells a security in violation of Section 5 of the Act shall be liable to the person purchasing from him for the consideration paid for such security plus interest thereon. 15 U.S.C. § 77*l*(1). Therefore, it is clear that an action for

15 U.S.C. §§ 77e(a) and (c).  In addition, Jennelle also alleges that Defendants violated the Alabama Securities Act, Ala. Code § 8-6-4, by not registering such securities with the Alabama Securities Commission prior to the distribution.

It is undisputed that Defendants sold Jennelle "securities" within the meaning of the federal and state legislation; it is also undisputed that Defendants offered or sold such securities without first filing a registration statement, either with the SEC or the Alabama Securities Commission.  Instead, Defendants argue that their sales efforts are exempt from these registration requirements under Section 4(2) of the Securities Act, 15 U.S.C. § 77(d)(2); Regulation D, 17 C.F.R. §§ 230.502(c)-(d), 230.504(b)(1), 230.505-.506; and under Section 8-6-11 of the Alabama Securities Act.

Present before the Court are cross-motions for summary judgment.  See Docs. Nos.

_____

damages for violation of the registration requirements of Section 5 must be brought under Section 12(a)(1) of the Act.  See, e.g., Babst v. Morgan Keegan & Co., 687 F. Supp. 255, 261 (E.D. La. 1988) (citing In re North American Acceptance Corp. Securities Cases, 513 F. Supp. 608, 618 (N.D. Ga. 1988)).  However, considering that this litigation has progressed to a relatively late stage, coupled with the fact that Defendants have not raised the issue, the Court will treat Plaintiff's federal claim as one brought under Section 12(a)(1).

As Plaintiff's briefs are replete with allegations of misstatements in writings distributed by Defendants, it is possible that Plaintiff also could be seeking rescission of the transaction under Section 12(a)(2) of the Act.  If the transaction were exempt from Section 5's registration mandate, the transaction could still be undone if the Court found misleading or false oral or written statements made by Defendants in the course of offering or selling BCDC securities. However, Plaintiff's legal arguments do not suggest that Plaintiff contemplated the possibility of bringing the instant action under Section 12(a)(2).  Plaintiff expressly raised the alleged misstatements for their relevance in determining whether the offerees were provided with the requisite information such that a Section 4(2) exemption for transactions not involving a public offering could attach, rather than for purposes of supporting an independent basis of liability. For this reason, the Court will not read the Plaintiff's proffered arguments as attempting to state a Section 12(a)(2) claim.

11 and 14. Interpreting the facts pertinent to each motion in the light most favorable to the opposing party, the Court concludes that Plaintiff is entitled to judgement as a matter of law. As the undisputed facts do not demonstrate that Defendant is entitled to any exemption from the federal registration requirements, the Court concludes that Plaintiff Jennelle's motion for summary judgment (Doc. No. 14) is due to be GRANTED, and Defendants' motion for summary judgment (Doc. No. 11) is due to be DENIED. The Court's reasoning is set forth below.

## I. FACTUAL BACKGROUND[2]

Defendants Gilinson and Goldfluss, also wife and husband, incorporated Defendant Birmingham Contemporary Design Center ("BCDC") on August 3, 2000. The purpose of BCDC was to sell high end European furniture to retail customers. Gilinson and Goldfluss (the "Founders") were at all times BCDC's sole officers and directors. In order to raise the capital needed to secure a loan from the Alabama Small Business Association, Gilinson and Goldfluss sought investors in BCDC.[3] This capital raising effort, done through the issuance

---

[2]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3]In July 2000, Compass Bank issued BCDC a contingent loan commitment for a $315,000.00 SBA-backed loan. The BCDC executed the promissory note to Compass Bank for the loan on March 23, 2001.

of shares in BCDC, is the subject of this litigation.

Prior to the incorporation of BCDC, the Founders, together with the University of Alabama Small Business Institute, had prepared a "Business Plan" that described generally BCDC and its future business operations. The Business Plan discussed the retail furniture industry in Birmingham, projected financial statements for the venture, the presence of risk inherent in the business, and various other facets of BCDC's prospects. In a section entitled "Capitalization," the Business Plan represented that the BCDC already had acquired $185,000 out of a total capital requirement of $500,000. The Business Plan further represented that the Founders were seeking to secure the remaining $315,000 through a "personally guaranteed" loan. The Business Plan made no mention of any shares of BCDC stock outstanding as of the time of the Business Plan, or of any future plans for the issuance of shares.

On August 11, 2000, the Founders began soliciting potential investors to purchase BCDC shares.[4] The Founders gave each of these potential investors, with one exception, a copy of the Business Plan, as well as a copy of the Subscription Agreement.[5] The Subscription Agreement stated that BCDC would issue a maximum of 480 shares of common stock, and that each share would be sold for $500.00.[6] In addition, the Subscription

---

[4]The Founders issued all BCDC shares between August 11, 2000 and February 28, 2001.

[5]Offeree Sam Corona did not receive either document.

[6]It is undisputed by the parties to this litigation that the Founders actually created 1,000 shares of BCDC "common stock" as opposed to 480. The issuance of 1000 shares was

Agreement provided, <u>inter alia</u>, the following recitations: that BCDC shares were being

offered without registration and pursuant to federal and state exemptions; that there would

probably never be a secondary market for BCDC shares; and that the shares were being

purchased for investment, rather than resale, purposes.[7] These documents relating to the

issuance of BCDC shares were distributed on an individual basis to approximately twenty-

five people.

Ultimately, the Founders issued 980 shares in the following distribution: (1) Randi

Gilinson (365 shares), (2) Edward Goldfluss (365 shares), (3) Richard Jennelle (100 shares),

(4) Lisa Shepard (40 shares), (5) Martha Gilinson (20 shares), (6) Michael Blumenthal (20

shares), (7) William Pantsari (20 shares), (8) Lynn Adams (20 shares), (9) Meri Glazer (10

shares), (10) Linda Taylor (10 shares), and (11) Donald and Bette Ann Blumenthal, as joint

-------------------------

authorized by the BCDC Articles of Incorporation.

[7]Each purchaser executed a Subscription Agreement. In addition, the Founders executed
a Stock Transfer Agreement and each purchaser executed an Agreement to be Bound by the
Stock Transfer Agreement. Although the Stock Transfer Agreement places a number of
restrictions on the resale of BCDC shares, it does not contain any limitation on resale due to the
unregistered status of the shares being sold in the proposed exempt transaction.
The Stock Transfer Agreement contains the agreed-upon Restrictive Legend to be placed
on each of the stock certificates. The Restrictive Legend does not warrant that the shares are
unregistered–it recites only that each purchaser agrees to be bound by "an Agreement" of a date
to be determined on an individual shareholder basis. Whether the "Agreement" referred to by the
Restrictive Legend is the Subscription Agreement or the Agreement to be Bound by the Stock
Transfer Agreement, is subject to considerably divergent interpretations by the parties and will be
discussed in some detail <u>infra</u>. Dr. Jennelle executed both the Subscription Agreement and the
Agreement to be Bound by the Stock Transfer Agreement on October 25, 2000, compounding the
ambiguity inherent in the language of the Restrictive Legend.

tenants with right of survivorship (10 shares).[8]

The record reveals facts indicating varying degrees of familiarity between the two Founders and the BCDC investors. Two of the purchasers were part of Randi Gilinson's family: Martha Gilinson is Gilinson's mother, and Meri Glazer is Gilinson's sister. Most of the other investors were friends of either one or both of the Founders prior to the issuance. Founder Goldfluss had known investor Lynn Adams for seven years by the time he sold her shares in BCDC, and it was through Adams that Goldfluss retained William Pantsari to serve as BCDC's architect. Adams and Pantsari often visited socially with the Founders, beginning around 1994 when Goldfluss and Gilinson first moved to Birmingham.[9] Goldfluss also enjoyed a pre-existing relationship with the Blumenthal buyers--Goldfluss had known Michael Blumenthal for two years prior to the issuance, during which time Michael had helped develop the BCDC's Business Plan. Goldfluss also had known Donald and Bette Ann Blumenthal, Michael's parents, for two years prior to the issuance; although the particulars of the relationship are not clear. Goldfluss had met Plaintiff Jennelle seven years prior to the stock issuance while walking their dogs. The Founders enjoyed both a social, and ultimately a business, relationship with Jennelle. Jennelle and Goldfluss kept in regular contact prior to, and during, the issuance.

Others of the purchasers were less well-known to the Founders. Linda Taylor is the

---

[9]William Pantsari and Lynn Adams were married to each other and lived together throughout the time that they invested in BCDC.

mother of one of Gilinson's friends, but the extent of her relationship with Gilinson is unclear. Introduced through a friend from Goldfluss's former job, Goldfluss had met Lisa Shepard at a party at Shepard's home at some unspecified time prior to the issuance.

No investor in BCDC ever was asked to fill out a questionnaire related to his or her background. However, the Founders did possess some knowledge with respect to the purchasers' educational backgrounds, net worth, and/or investment experience. Gilinson testified that she knew Pantsari to be a Harvard-educated architect and a Fulbright Scholar, but she did not know his precise net worth or his investment experience. Goldfluss testified that he knew that Shepard possessed a "fairly large [stock] portfolio," that she had a financial consultant, and that she was a professional interior designer, but he did not know her net worth or educational background. Goldfluss testified that he knew Adams and her husband, Pantsari, each owned a business, that the couple held real estate investments, and that they owned their home. The Founders knew that Michael Blumenthal, not only possessed expertise in business in a general sense, but also knew a great deal about BCDC through his lead role in developing its business plan.

The Founders did not know whether any potential or actual investor in BCDC had ever purchased stock by means other than through a stock broker. With respect to Michael's parents, Donald and Bette Ann Blumenthal, the Founders were aware that they had purchased stock in the past, but they did not know whether they had ever purchased stock by means other than through a broker. Although Goldfluss testified that he knew Adams and Pantsari

had purchased stock, Goldfluss similarly admitted that he did not know whether they had ever purchased stock other than through a stock broker.

Some of the individuals solicited by the Founders did not purchase shares in BCDC. The Founders discussed the possibility of investing in BCDC with Susan Whatley, John Day, Neil Roth, Charles Collatt, Sam Corona,[10] and Trudy Cantor, as well as with the above-mentioned purchasers.  In addition, there were several other individuals solicited to purchase shares listed in Defendants' Brief with no apparent relationship to the Founders or to each other.  The members of this group are: Leo Shaia, Tom Williams, Steve Woods, Remegius Shatas, Pete Hollstein, Larry Cohn, Kathy Snow, and Finlay Ross. See, Doc. No. 13, pp. 31-33.[11]  The Founders enjoyed  pre-existing relationships with  several members of this non-purchasing offeree group.

---

[10]Although Defendants "dispute" that Sam Corona was in fact offered BCDC shares, Defendant Goldfluss's deposition testimony belies such an assertion.  "Q.  You called [Corona] on the phone and asked him to invest in the business?  A.  No.  I asked him since he was in the importing business, importing furniture from Europe and this is in the line of business, I asked him if he would be interested in reviewing the business plan probably with an eye to invest in it, yes."  Regardless of the fact that Defendants did not ultimately deliver to Corona a Business Plan or any other selling document, such a preliminary conversation was likely an "offer."  See Securities Act Release No. 285, 1 Fed. Sec. L. Rep. (CCH) ¶¶ 2741-2744 (Jan. 24, 1935) ("Since any attempt to dispose of a security is an offer, preliminary negotiations or conversations with a substantial number of offerees will cause the offering to be public in nature.").

[11]Defendant Goldfluss also testified that a Business Plan was given to John Bates.  See Doc. No. 16, Exh. 3, p. 66.  It is unclear from the parties' pleadings whether John Bates was an "offeree" of BCDC shares.  It seems that Bates was an officer of Compass bank and was working with the Founders on their loan application.  See Doc. No. 16, Exh. 3 p. 28.  However, at other places in the same deposition, it seems that Bates may have been an offeree.  For the purposes of these motions for summary judgment, the Court will assume that Bates was not an "offeree."

Trudy Cantor is another sister of Defendant Gilinson.  The Founders  met Charles Collatt the same way that they had met Jennelle in 1994-while walking their dogs.

Defendant Goldfluss was introduced to Susan Whatley through a mutual friend. Apparently, Whatley had heard about the proposed BCDC venture and was enamored of the BCDC concept.  Whatley approached Goldfluss and mentioned that she owned an apartment in New York City that was furnished entirely with one of the lines that the Founders intended to carry at the BCDC.  After the Founders gave Whatley a copy of the Business Plan and Subscription Agreement for her attorney to review, she tendered a $10,000 check to the Founders.  Whatley did not end up purchasing any BCDC shares because her attorney had demanded modifications to the Stock Transfer Agreement that were unacceptable to the Founders.  The Founders therefore refunded Whatley's money prior to Whatley's receipt of any BCDC shares.

Goldfluss was introduced to John Day through Plaintiff.  According to the Founders, Plaintiff brought Day to discuss investing in BCDC on his own volition, without any coercion or suggestion by the Founders.[12]

Goldfluss met Neil Roth through a referral by John North, an officer of the NBC Bank and also an Officer in the Birmingham Venture Club.  The Founders did not know Roth prior

---

[12]Both Goldfluss and Gilinson testified that Plaintiff solicited others in investing in BCDC without the Founders' knowledge.  Plaintiff asked the Founders for additional copies of the Business Plan to circulate, and the Founders supplied the requested documents.  However, the Founders denied having any specific knowledge as to Plaintiff's solicitation activities.

to the BCDC issuance.

Similarly, Goldfluss met Sam Corona through a mutual acquaintance during the time of the BCDC stock issuance. Corona and the Founders had no relationship prior to the BCDC share distribution.

Plaintiff executed a Subscription Agreement on October 25, 2000 in which Jennelle agreed to purchase 100 shares of "common stock" in BCDC at $500.00 per share for a total purchase price of $50,000.00. Plaintiff alleges that the Founders had told him that his investment was needed to secure the SBA loan, which was set to close the following week. Plaintiff tendered a check for the full purchase price of the 100 shares to the Founders, and the SBA loan ultimately closed.

By letter dated March 20, 2001, Plaintiff, through counsel, demanded the return of the consideration paid for the BCDC shares in exchange for return of said shares. Plaintiff's affidavit that his demand for rescission was catalyzed by what Plaintiff perceived as self-dealing transactions by the Founders, resulting in dilution of the value of his BCDC shares.[13] The Founders refused to return Plaintiff's money, averring that they had fulfilled all of the conditions contained in the Subscription Agreement. The instant litigation followed.

---

[13]The following are some of the Founders' alleged activities to which Dr. Jennelle objected: their purchase of 520 BCDC shares on August 11, 2000 for $1.00 each (while all the other shares were sold to the other investors for $500.00 each); overvaluing the Founders' "sweat equity" which served as partial payment for the Founders' February 27, 2001 purchase of 210 additional shares; and secretly preserving rights of first refusal as to all shares remaining unsold at the close of the initial distribution. As Plaintiff's Section 12(a)(1) claim is one based on strict liability, these allegations are not relevant to his federal securities claim.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a plaintiff or a defendant may move "with or without supporting affidavits" for summary judgment in its favor on "a claim" or "any part thereof." Fed. R. Civ. P. 56(a) and (b). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the

court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2110 (2000) (quoting 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529, at 299).

Because the parties have filed cross-motions for summary judgment, the Court must view the evidence in the light most favorable to the Defendants when considering Plaintiff's motion, and view the evidence in the light most favorable to Plaintiff when considering the Defendants' motion.

## III. DISCUSSION

Plaintiff's Federal Securities Act Claim

The Securities Act of 1933 was enacted by Congress as a responsive prophylactic measure to the economic crisis gripping the United States following the 1929 stock market crash. In accordance with such remedial purpose, the Act has been interpreted as imposing strict liability upon individuals who offer or sell securities in an interstate commerce setting, unless it is shown that such securities or the transaction itself fall within an exemption from the registration requirements.[14] See, e.g., Swenson v. Englestad, 626 F.2d 421 (5th Cir.

_____

[14]Section 5 of the Act provides, in pertinent part, that:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly--
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or

1980).   It is uncontested that the BCDC investments offered are securities, and that Defendants offered or sold such securities without first filing a registration statement. However, Defendants argue that their efforts are exempt from these registration requirements under Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), or, in the alternative, under Regulation D, 17 C.F.R. §§ 230.502(c)-(d); 230.504(b)(1); 230.505-.506.

1. Section 4(2) Exemption for "Private Offerings"

Transactions by an issuer not involving public offerings are expressly exempted from the Securities Act's registration requirements.  15 U.S.C. § 77d(2).  To determine whether an issuer's offerings qualify for this exemption, the Supreme Court has held that courts must examine whether allowing the exemption is consistent with the promotion of the "full disclosure of information thought necessary to informed investment decisions" and whether "the class of persons affected needs the protection of the [Securities] Act."  SEC v. Ralston Purina Co., 346 U.S. 119, 124-25 (1953).

Courts applying this mandate have identified various factors that should be considered

---

otherwise; or
(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or delivery after sale.

15 U.S.C. § 77e(a).

Section 12(1) imposes civil liability upon persons violating Section 5, and authorizes recovery from "(a)ny person who (1) offers or sells a security in violation of Section 77e of this title . . .."

15 U.S.C. § 77l(1).

in determining whether an offering is exempt under Section 4(2): (1) the number of offerees; (2) the sophistication and experience of the offerees; (3) the relationship of the offerees to each other and to the issuer; (4) the nature and kind of information that has been provided or to which the offerees have access; (5) the size and manner of the offering and precautions taken to prevent the offerees from reselling the securities.  See, e.g., SEC v. Life Partners, 912 F. Supp. 4, 10 (D.D.C. 1996) (citing Western Fed. Corp. v. Erickson, 739 F.2d 1439, 1442 (9th Cir. 1984)).  Whether a transaction involves a public offering depends not on any one factor but on all the surrounding circumstances.  See Butler v. Phlo Corp., 2001 WL 863426, * 6 (S.D.N.Y.) (citing Hirtenstein v. Tenney, 252 F. Supp. 827, 830 (S.D.N.Y. 1966)).  Moreover, these factors are "simply criteria which are helpful in arriving at the ultimate determination." Id. (quoting SEC v. Universal Major Indus. Corp., 646 F.2d 1044, 1047-48 (2d Cir. 1976)).  As the existence of each of these factors is disputed by the parties, the Court will now endeavor to examine each element.

(i) *The Number of Offerees*

While the number of offerees is not itself dispositive of the existence of a public offering, see Ralston Purina, 346 U.S. at 125 & n.11, the fact that there were only twenty-five offerees contacted by BCDC to purchase shares suggests a non-public offering.  However, there seems to be little agreement among the lower federal courts as to how to weigh this factor in the overall calculus of determining an offering to be public.  Compare Weprin v. Peterson, 736 F. Supp. 1124, 1129 (N.D. Ga. 1988) (finding 228 offerees to be a "limited

number" serving to distinguish the offerees from the public) with G. Eugene England Foundation v. First Federal Corp., 663 F.2d 988, 990 (10th Cir. 1973) (finding a public offering where there was one offeree); Butler v. Phlo Corp., 2001 WL 863426, at * 6 (noting in dicta that even if there were two offerees, there still could be a public offering). Therefore, the Court will examine the other factors to be considered.

### (ii) *Offeree Sophistication*

With respect to offeree sophistication, as with the "number of offerees" prong, the presence of sophistication is not dispositive–in other words, sophistication of the purchasers is no substitute for their possessing information. See, e.g., Lawler v. Gilliam, 569 F.2d 1283, 1289 (4th Cir. 1978) ("But 'sophistication' is not a substitute for 'access to the kind of information which registration would disclose.'") (citation omitted), rev'd on other grounds; Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 690 (5th Cir. 1971) (same), rev'd on other grounds; SEC v. International Mining Exch., Inc., 515 F. Supp. 1062, 1071 (D. Colo. 1981) (citations omitted). As Judge Goldberg stated:

> [T]here must be a sufficient basis of accurate information upon which the sophisticated investor may exercise his skills. Just as a scientist cannot be without his specimens, so the shrewdest investor's acuity will be blunted without specifications about the issuer. For an investor to be invested with exemptive status he must have the required data for judgment.

Doran v. Petroleum Management Corp., 545 F.2d 893, 903 (5th Cir. 1977). Although there are several factors that the courts use to help determine whether offerees are sophisticated

– the level of education of the offeree, the offeree's net worth, the offeree's investment experience – the "sophistication" requirement is a continuum as opposed to an all-or-nothing proposition. The relevant inquiry is "whether the investor can understand and evaluate the nature of the risk based on the information supplied to him." Section 4(2) and Statutory Law: A Position Paper of the Federal Regulation of Securities Committee, Section of Corporation, Banking and Business Law of the American Bar Association, 31 Bus. Law. 485 (1975). Based on the undisputed facts discussed infra, the Court concludes that the offerees were not "sophisticated."

In order to assure offeree sophistication, issuers often attempt to document the backgrounds of those to whom offers are made. These precautions are taken so as to demonstrate the issuer's vigilance in maintaining a non-public offering in the face of a challenge such as the one being made by Dr. Jennelle before this Court. See, e.g., Western Fed. Corp. v. Erickson, 739 F.2d 1439, 1442-43 (9th Cir. 1984) (the issuer claimed use of a numbering system on offering circulars, but did not provide the court with exact information on the offerees); SEC v. Life Partners, Inc., 912 F. Supp. 4, 10 (D.D.C. 1996) ([D]efendants have the burden of identifying all offerees, and because [they] cannot provide this information, defendants' offerings do not qualify for exemption under section 4(2)."). It is undisputed that the Founders did not number all informational materials distributed to offerees. Indeed, the Founders gave Plaintiff additional unnumbered copies of the Business Plan to distribute to others. Although Defendant Goldfluss testified that Jennelle requested

the copies without any encouragement from the Founders, Goldfluss conceded that the Founders *expected* that Jennelle's intention was to solicit additional investors, and they "*hoped*" he would do so. Such carelessness with respect to the offering serves only to imperil the chances that the distribution fall within an exemption from registration. The Founders plead ignorance, insofar as they maintain that they held no desire for Plaintiff to recruit other BCDC investors and that the specifics of any such activities were unknown to the Founders. However, such willful blindness does not preserve the exempt status of the offering. Cf. United States v. Hill, 298 F. Supp. 1221, 1230-31 (D. Conn. 1969) (finding certain activities by the issuer to have been evidence of issuer's knowledge of secondary distribution of securities issued pursuant to an alleged private placement, thus destroying such exemption).

Also, the Defendants did not attempt to screen offerees by having them fill out questionnaires regarding their backgrounds. An independent examination of the offeree group's sophistication reveals a paucity of information in this area. With respect to offeree Neil Roth, the Founders state that, because Roth was referred by John North (a banker and officer of the Birmingham Venture Club), the Founders were entitled to believe that Roth was sufficiently sophisticated. Offeree Sam Corona was known to be involved in the furniture business, but nothing else related to his sophistication is apparent. The Founders knew that Charles Collatt owned the Mayer Electric company, but nothing else is apparent in the record concerning his level of sophistication. John Day apparently had some

experience on Wall Street, and, because Plaintiff considered Day an authority on investment matters, Defendants believed Day to be a qualified investor. Susan Whatley appeared to Founders as if she had a good deal of disposable capital, but the record contains no facts about their knowledge of her net worth, investment experiences, or educational background. Trudi Cantor, Meri Glazer, and Martha Gilinson are all members of the Founders' immediate family, but little else about the Founders' knowledge of their level of sophistication as investors is apparent in the record. The Founders knew both the elder Blumenthals and Linda Taylor had purchased stock before, but nothing is apparent regarding the type of such past investment activity (such as the level of risk involved). Beyond the fact that the Blumenthals and Linda Taylor had purchased *some* kind of stock before, nothing else about their level of sophistication is contained in the record.

Similarly, nothing at all is contained in the record about other offerees listed in Defendants' brief at pages 31-33, and 36-37. Nothing at all is apparent regarding the sophistication of the following offerees: Tom Williams, Steve Woods, Remegius Shatas, Pete Hollstein, Larry Cohn, Kathy Snow, Leo Shaia and Finlay Ross. The mere fact that the Subscription Agreement executed by all of the purchasers of BCDC shares contained a recitation acknowledging that the purchaser has the requisite business acumen to understand the risks of the investment does not automatically establish sophistication. Such a "self-serving" boilerplate statement is contrary to the express terms of the Securities Act. See, JAMES COX, ET AL., SECURITIES REGULATION: CASES AND MATERIALS 388 (2d ed. 1997)

(citing Section 14 of the Security Act's prohibition on any stipulation that serves to waive compliance with the federal securities laws).  Moreover, only purchasers of BCDC shares executed Subscription Agreements.  As sophistication is to be based on the status of the *offerees*, rather than of the *purchasers*, the Subscription Agreements signed by investors cannot establish sophistication for the entire group of offerees.  See Doran, 545 F.2d at 902. Therefore, though Lynn Adams, William Pantsari, Michael Blumenthal, Lisa Shepard and Richard Jennelle may have been sophisticated, the undisputed facts demonstrate that Defendants have not met their burden of creating a factual issue with respect to their entitlement to an exemption with respect to the "offeree sophistication" tine of the Section 4(2) analysis.

(iii) *Availability of Information and the Relationship Between the Issuer and the Offerees*

Even if the Court were to find that Defendants had created an issue of material fact with respect to investor sophistication, "[s]ophistication is not a substitute for access to the information that registration would disclose."  Doran, 545 F.2d at 902-03 (holding that an engineering degree, investment experience, and large net worth were insufficient to show a private offering exemption absent a "sufficient basis of accurate information upon which the sophisticated investor may exercise his skills.")  Defendants contend that each of the offerees held a special position with respect to BCDC such that each offeree had access to

the type of information that would be have been disclosed in a registration statement.[15] To the extent that an issuer relies on the offerees' "access" to this sort of information, an issuer must demonstrate that the offerees occupied a privileged position relative to the issuer that provided them an opportunity to gain access to the requisite information. Such access can be made out by demonstrating an employment or family relationship with the issuer, or economic bargaining power with respect to the issuer. Doran, 545 F.2d at 903. An alternative route to showing that information was made "available" is a demonstration that there has been actual disclosure of the same information that would have been disclosed through registration. Id. at 903-04. Such actual disclosure would obviate the need for "access" to registration-equivalent information.

The Business Plan distributed to all offerees by Defendants falls short of being a Schedule A-compliant offering circular. For example, the Defendants omitted the following Schedule A-required information from the Business Plan: (1) the amount of stock to which the directors and executive officers of the company intend to subscribe (15 U.S.C. § 77aa(7)); the remuneration, including amounts to be reimbursed, paid or estimated to be paid by the issuer during the past year and in the ensuing year to the officers and directors of the

---

[15]There are thirty-two categories of information that must be included in a registration statement. Securities Act of 1933, Sched. A, 15 U.S.C. § 77aa. For example, the issuer must disclose the nature and general character of the issuer's business; its capital structure; the remuneration to be paid to the issuer's officers and directors and other employees; amounts, itemized in reasonable detail, of expenses incurred in connection with the sale of the security; and a detailed balance sheet of the assets and liabilities of the issuer certified by an independent public or certified accountant. Id.

company (15 U.S.C. § 77aa(14)); (3) any variation between the price at which the securities are being offered for sale . . . and the price at which they are being offered to other persons such as officers and directors (15 U.S.C. § 77aa(16)); (4) amount or estimated amounts, itemized in reasonable detail, of expenses incurred or borne by or for the account of the issuer in connection with the sale of the securities offered (15 U.S.C. § 77aa(18)); and (5) any amount . . . intended to be paid to any promoter and the consideration for any such payment (15 U.S.C. § 77aa(20)).   In addition, Defendants misrepresented in the "Capitalization" section of the Business Plan that they had already acquired $185,000 of the total needed capital, when in reality it had not yet received such funding.[16]  Finally, the Court agrees with the Plaintiff that the section of the Business Plan entitled "Critical Risks" presented a cursory, sales-oriented discussion of risk. Three risks were mentioned, two of which BCDC offered immediate "solutions" seemingly nullifying the possibility of such risks.  Essentially the Business Plan is more like a document designed to stimulate investment than one designed to provide investors with the information mandated by Schedule A of the Act. It is undisputed that the Business Plan was the only document given to all BCDC offerees, and it is not contended that offerees were given Schedule A-

---

[16]In her deposition, Gilinson conceded that BCDC was at least $50,000.00 short of its $185,000.00 goal as of February, 2001. See Doc. 16, Exh. 2, at 60. The Business Plan was prepared and distributed approximately six months prior to BCDC's raising the $185,000.00 needed to secure the SBA loan of $315,000.00. Later in her deposition, Gilinson conceded that even though the Founders believed that they had all of the investors "lined up" at the time that they applied for the SBA loan, they had not yet received the investor funds. Id. at 72-74.

equivalent information orally.[17]  Taken together, these omissions and misrepresentations indicate that the offerees were given the same information a registration statement would have provided. Because there was no actual disclosure, the Court will next examine whether there was sufficient "access" to information such that it was available to the offerees.

In determining whether the offerees had access to BCDC information, the critical inquiry is whether the individual members of the offeree group had a "realistic opportunity to learn facts essential to an investment judgment." Doran, 545 F.2d at 909. "[W]hen the issuer relies on 'access' absent actual disclosure, he must show that the offerees occupied a privileged position relative to the issuer that afforded them an opportunity for effective access to the information registration would otherwise provide." Id. at 906. "[A] position of access mean[s] . . . a relationship based on factors such as employment, family, or economic bargaining power that enables the offeree effectively to obtain such information." Id. at 903.

In the instant case, three members of the approximately twenty-five offerees are relatives of the Founders (Martha Gilinson, Meri Glazer and Trudi Cantor). None of the offerees were employees of Defendants or had substantial bargaining power over Defendants such that she could obtain registration information.. Although Defendants make

---

[17]Defendants assert that offerees were provided with "all information about [BCDC] . . .orally through discussions with the Founders." Doc. No. 13, p. 40.  The Court does not understand that naked assertion to mean that the offerees were actually provided with Schedule A information.  However, even if the Court were to interpret that assertion as meaning the offerees were given the requisite information, without any accompanying support, the assertion is of little value to Defendants' cause.

the unsupported assertion that the offerees "had unlimited access to all information about the Company, the proposed Business Plan of the Company, and the Founders themselves," see Doc No. 13, p. 40, such a conclusory statement will not defeat a motion for summary judgment. See Western Fed. Corp. v. Erickson, 739 F.2d 1439, 1443 (9th Cir. 1984). The "relationship chart" contained in Defendants' brief shows that the requisite relationships did not exist with respect to all, or even most, of the offerees. "Friend," or in many cases "friend of a friend" status does not automatically import the sort of relationship contemplated in *Doran* with respect to providing the investor access to information.[18]

Plaintiff also contends that, because BCDC was a start-up company that was dependent on its investors to secure a needed loan, every offeree had bargaining power sufficient to provide access to all registration-level information. Plaintiff does not cite this Court to any authority for this open-ended proposition, and the Court is unaware of any such axiom. In cases in which an investor's access to information is predicated on investor bargaining power, the courts have relied on salient displays of such bargaining power between the parties. See, e.g., Van Dyke v. Coburn Enterprises, Inc., 873 F.2d 1094, 1098 (8th Cir. 1989) (finding that the investors' ability to bargain down the purchase price of the securities, together with the investors' ability to negotiate changes in the Stock Purchase

---

[18]While friendship between an offeree and an issuer might be helpful in determining the substance or duration of a relationship, and therefore probative of the question of whether there was a general solicitation, it is less helpful in determining whether an offeree was in a position of access to essential corporate information. Nonetheless, the Court finds that most of the offerees did not occupy positions relative to the issuers that afforded them access to Schedule A-type information.

Agreement, demonstrated that through their bargaining power the investors had access to information).

In the instant case, the Founders unilaterally set the terms of the offering with respect to all offerees. The only attempt on the record of any investor to modify the terms of the investment was rejected by the Founders. When Susan Whatley's counsel attempted to negotiate modifications to the Stock Purchase Agreement, the Founders refused to accept her as a BCDC investor. See Doc. No. 16, Exh. 3 at 41. In the absence of any other evidence tending to demonstrate unusual investor bargaining power, the Court concludes that there was not sufficient offeree access to BCDC information.

(iv) *Size and Manner of Offering, and Precautions Taken to Prevent Resale*

The BCDC offering bears many of the earmarks of a private offering. The amount of capital raised, the number of offerees, the number of purchasers, the number of shares sold, and the personal nature of the offering all are consistent with private placement status. The BCDC offering generated $185,000.00 in capital, through the sale of common stock to nine or ten investors. Save for the couple of people solicited by Plaintiff, each of the approximately twenty-five offerees appears to have been personally contacted by the Founders. However, as discussed supra, the Founders did not take the usual precautionary measures, such as numbering the Business Plans or having offerees fill out background questionnaires.

Issuers commonly take three steps to avoid the problem of initial purchasers acting

as conduits in the public distribution of securities.  First, they require purchasers to sign

statements of investment intent noting that transfer of the securities is restricted.  Second,

issuers normally inscribe securities placed in a private offering to disclose that the securities

are unregistered and a transfer may take place only if specified conditions are satisfied.

Third, issuers put into effect stop-transfer orders, which instruct the transfer agent not to

process any transfers of restricted securities without the consent of the issuer.  See, JAMES

D. COX, ET AL., SECURITIES REGULATION, CASES AND MATERIALS 391 (2d ed. 1997).

Although the statutory exemption is not conditioned on the presence of any or all of these

devices to restrict transferability, the courts have found that the absence of these measures,

without a valid excuse, could lead to the denial of the exemption.  See, e.g., Hill, 298 F.

Supp. at 1231.

    In the instant case, the Founders had all purchasers of BCDC shares sign

Subscription Agreements that recited that transfer of the shares was restricted.  The stock

certificates, however, were not inscribed with an expressly restrictive legend.  Rather, the

Legend on the stock certificates read:

> The sale or transfer of this certificate is subject to the
> terms and conditions of an Agreement dated the ___ day
> of ___, as may be amended from time to time, a copy of
> which is on file with the Secretary of the Corporation and
> may be reviewed upon request.  By acceptance of this
> certificate, the holder hereof agrees to be bound by the
> terms of said Agreement.

It is unclear from the Legend whether the "Agreement" referenced is the Subscription

Agreement, or the Agreement to be Bound by the Stock Transfer Agreement. In the case of Plaintiff, both agreements were executed on the same day. Therefore the date filled in on the stock certificate does not help identify which agreement was referenced by the Legend. The ambiguity is significant, because the Subscription Agreement does recite the restricted nature of the shares, while the Stock Transfer Agreement and the Agreement to be Bound thereto do not. The result is that it would not have been clear to the purchasers of BCDC shares based on the stock certificate legend, whether the shares were restricted or not.[19] The parties disagree as to the proper interpretation of the Restrictive Legend. However, the parties do not dispute the substance of the several documents, or the facts concerning their distribution. This dispute is legal rather than factual; the Court concludes that the Restrictive Legend does not state that the securities are unregistered or that resale is restricted.

In any event, except for Susan Whatley, no non-purchasing offeree was given either a Subscription Agreement, Stock Transfer Agreement, or Agreement to be Bound. See Doc. No. 16, Exh. 3, pp. 65-66. It is undisputed that the Business Plan contains no mention of the BCDC shares, much less the extent to which such shares are restricted. The only information held by at least half of the offeree group did not inform the offerees of any prohibition on resale of BCDC shares.

Finally, the Founders made no effort to put into effect stop-transfer orders, or to obtain an SEC "no-action" letter regarding the distribution. Because of the shortcomings in

_____

[19]It appears that the date of execution for both the Agreement to be Bound and of the Subscription Agreement was the same for all of the BCDC purchasers.

Page 26 of 34

Defendants' precautions taken to prevent resale of BCDC shares, this Court would be loathe to conclude that defendants' motion for summary judgment on this ground is appropriate. However, because the Court has found that Schedule A-level information was not available to the offerees, regardless of the fact that the Court concludes, on balance, the other factors discussed <u>supra</u> do not singly or together mandate a particular result, the Section 4(2) exemption does not operate. <u>Cf.</u>, <u>McDaniel v. Compania Minera Mar de Cortes, Sociedad Anonimo, Inc.</u>, 528 F. Supp. 152, 164 (D. Ariz. 1981). The Court concludes that Defendants, both in opposition to Plaintiff's motion for summary judgment and in support of their own motion for summary judgment, have failed to meet their burden of demonstrating that the Section 4(2) exemption from the Act's registration requirement applies, or even of raising an issue of material fact concerning the applicability of such exemption. Therefore, the Court concludes that Plaintiff is entitled to summary judgment with respect to the availability of a Section 4(2) exemption. <u>Cf.</u> <u>Butler v. Phlo Corp.</u>, 2001 WL 863426, *8 (S.D.N.Y.).

     2. <u>Regulation D Exemption</u>

     In the alternative, Defendants claim that they are entitled to an exemption from Section 5 under Regulation D, 17 C.F.R. §§ 230.502(c)-(d), 230.504(b)(1), 230.505-.506. Rules 504, 505 and 506 establish three separate exemptions from registration or safe harbor provisions for certain limited offerings. In the instant case, Rule 502(c), prescribing limitations on the manner of the offering, is a prerequisite for finding that any of the three

safe harbor provisions attaches.[20]   Rule 502(c) provides that no issuer shall offer or sell

securities by means of a general solicitation or by general advertising. "General solicitation"

is a term of art that has been subject to an interpretive gloss, in that its existence turns on the

absence of preexisting relationships between the issuer and the offerees. See, e.g., In the

Matter of Kenman Corp., Fed. Sec. L. Rep. (CCH) ¶ 83, 767, at n.6 (Apr. 19, 1985) ("In

determining what constitutes a general solicitation, the Commission's Division of

Corporation Finance has underscored the existence and substance of pre-existing

relationships between the issuer and those being solicited. . . ."). While the purpose of the

pre-existing relationship requirement seems to be to ensure the issuer's ability to assess

whether the investment is suitable for the offeree, see Mineral Lands Research & Marketing

---

[20]The Rule 504 exemption for limited offerings not exceeding $1,000,000.00 provides
that Rule 502(c)'s prohibition on general solicitation does not apply where offers and sales are
made:

(1) Exclusively in one or more states that provide for the registration of the securities, and require
the public filing and delivery to investors of a substantive disclosure document before sale , and
are made in accordance with those state provisions;
(2) In one or more states that have no provision for the registration of the securities or the public
filing or delivery of a disclosure document before sale, if the securities have been registered in at
least one state that provides for such registration, public filing and delivery before sale, offers
and sales are made in that state in accordance with such provisions, and the disclosure document
is delivered before sale to all purchasers (including those in the states that have no such
procedure); or
(3) Exclusively according to state law exemptions from registration that permit general
solicitation and general advertising so long as sales are made only to "accredited investors" as
defined in Rule 501(a).

17 C.F.R. § 230.501(b)(1).  As the Defendants do not contend that any of these conditions is
present in the instant case, Rule 502(c) is therefore applicable to all three safe harbor provisions.

Corp., SEC No-Action Letter, 1985 WL 55694 (Nov. 4, 1985),[21] it also seems that no amount

of suitability or investor sophistication can save an offering from registration where

preexisting relationships are absent under Rule 502(c). See Securities Act Release No. 6455

quest. 60, 1 Fed. Sec. L. Rep. (CCH) ¶ 2380 (Mar. 3, 1983).[22]

With respect to Rule 502(c)'s prohibition on general advertising, it is undisputed that

the Founders fully complied with that mandate. However, it appears that the Founders failed

---

[21]"The types of relationships with offerees that may be important in establishing that a general solicitation has not taken place are those that would enable the issuer . . . to be aware of the financial circumstances or sophistication of the persons with whom the relationship exists or that otherwise are of some substance and duration." Mineral Lands Research & Marketing Corp., SEC No-Action Letter, 1985 WL 55694, * 2 (Nov. 4, 1985).

[22]Defendants argue that the presence of preexisting relationships between the issuer and the offerees is not the only factor to be considered in determining whether a general solicitation occurred. See Doc. No. 20, pp. 6-7. Defendants cite to an SEC no-action letter as support for this position: "The Commission's staff has issued a number of interpretive letters concerning the general solicitation requirement which have involved prior relationships. . . . The staff has never suggested, and it is not the case, that prior relationship is the only way to show the absence of general solicitation." Securities Act Release No. 6825 n. 12, [1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84, 404 (Mar. 14, 1989). However, in response to this assertion, several leading securities regulation scholars noted that, "Most would disagree with the staff's statement." See James D. Cox, et al., Securities Regulation: Cases and Materials at 411 (2d ed. 1997).
It is true that one district court seemed to interpret Rule 146(c), a precursor to Rule 502(c), as depending on a multi-factor examination. In Johnston v. Bumba, 764 F. Supp. 1263, 1274-75 (N.D. Ill. 1991), the court analyzed whether the issuer had identified or precisely numbered all offerees, the size of the offering, and also the extent to which the issuer had enjoyed prior relationships with the offerees. Of course this Court is not bound to defer to a District Court in another circuit. Although this Court reads Rule 502(c)'s prohibition on general solicitation as turning on the existence of preexisting relationships, this Court would still find that Defendants engaged in a general solicitation even under the *Johnston* approach. As we discussed supra in connection with the availability of the Section 4(2) exemption, the Founders failed to number the Business Plans they distributed and facilitated Plaintiff's further solicitations of BCDC shares to other unknown persons. As the Founders testified that they "hoped" that such secondary solicitation would occur, it would be a strange result indeed were this Court to conclude that there was no general solicitation simply because such solicitation efforts did not yield more ultimate purchasers of BCDC stock.

to have offered shares of BCDC only to individuals with whom they enjoyed pre-existing relationships such that they could assess the suitability of investment. Defendant Goldfluss met Lisa Shepard once at a party, and learned that she had a "large [stock] portfolio" and consulted a financial advisor. The contents of her portfolio (did she hold high-yield, high risk stocks? "Blue chip" stocks? Low-grade or high grade corporate debt? Convertible debentures?) remained unknown to Goldfluss. Goldfluss did not know Shepard's net worth or investment history and certainly did not enjoy a relationship with Shepard of such "substance" or "duration" that would have allowed Goldfluss to come to know these "suitability" details. Although Linda Taylor was the mother of Defendant Gilinson's co-worker, it does not appear that the Founders had ever met her prior to the offering. Not surprisingly, the Founders did not know Taylor's employment history, her net worth, or anything about her investment history. It seems unlikely that the Founders would have been able to ascertain whether Taylor's investing in BCDC was appropriate given her unique position. Although Goldfluss testified that he had known Donald and Bette Ann Blumenthal for two years prior to the offering, Goldfluss's inability to give a single detail regarding their fitness for purchasing BCDC shares suggests that the relationship was of little substance in this area.[23] The fact that the Blumenthals' son was a college business major who had helped develop the primary BCDC selling document was not a reasonable basis from which to conclude that the Founders possessed adequate information that the Blumenthals were

---

[23]Goldfluss testified only that he knew that the Blumenthals had purchased some type of stock in the past. See Doc. No. 16, Exh. 3, p. 18.

suitable BCDC investors.

John Day, Neil Roth, and Susan Whatley were unknown to the Founders prior to the offering. Defendants concede that the Founders enjoyed no prior relationship with Day, Roth, or Whatley, but instead they argue that the Founders reasonably believed that the three were sophisticated investors. The Founders' knowledge regarding Roth was limited to the fact that he had once owned a furniture business; however, they had no knowledge of his present fiscal health or his past investment experience. The Founders knew nothing about Whatley other than the fact that she "had" an apartment in New York City outfitted with imported furniture. In any event, the Court reads the SEC's position on Rule 502(c) as mandating a pre-existing relationship before a general solicitation can be deemed avoided. See supra, Securities Act Release No. 6455 quest. 60, 1 Fed. Sec. L. Rep. (CCH) ¶ 2380 (Mar. 3, 1983). Therefore, the fact that Whatley, Roth and Day were offerees of BCDC shares supports the proposition that the Founders conducted a general solicitation.

Moreover, the Founders had no prior relationship with Sam Corona, Leo Shaia, or the "friend of Dr. Jennelle's" (offeree number 25 on Defendant's Offeree Chart) and apparently knew nothing about their suitability for investing. Finally, nothing at all is known about the duration or substance of the Founders' relationships with the following individuals: Tom Williams, Steve Woods, Remigius Shatas, Pete Hollstein, Larry Cohn, Kathy Snow, or Finlay Ross. Under this Court's interpretation of the scattered information in the record regarding the relationships between the Founders and the offerees, the Founders had no preexisting

relationship with roughly half of the offeree group. The Court concludes that Defendants engaged in a "general solicitation" of BCDC stock in contravention of Rule 502(c). Cf. Johnston v. Bumba, 764 F. Supp. 1263, 1274 (N.D. Ill. 1991) (finding that one-third of the entire offeree pool lacked a preexisting relationship with the issuers, supporting a conclusion that no Regulation D exemption was available).

Therefore, the Court concludes that Defendants have not met their burden in demonstrating their entitlement to an exemption from registration under Regulation D, nor have they demonstrated the existence of a genuine issue of material fact with respect to any such exemption.

3. Section 3(a)(11) Exemption for Intrastate Offerings

Defendants finally attempt to argue that the intrastate offering exemption contained at Section 3(a)(11) and Rule 147 exempts the BCDC transactions from registration. The Court finds no basis for this contention. It is undisputed that two of the ten purchasers of BCDC shares, Martha Gilinson and Meri Glazer, were residents of New York at the time of the BCDC share issuance. The residence requirement of both these provisions was intended by the SEC to be read narrowly. See Securities and Exchange Commission, Exchange Act Release No. 5450 (Jan. 7, 1974) ("The object of the Section 3(a)(11) exemption . . . is best served by interpreting the residence requirement narrowly). Every court that has passed on the matter of which this Court is aware has come to the same conclusion. See, e.g., Hillsborough Investment Corp. v. SEC, 276 F.2d 665, 668 (1st Cir. 1960) ("[a]n entire issue

must be sold only to [in state] residents or the [Section 3(a)(11)] exemption is lost."); <u>see also</u>, <u>Sorrell v. SEC</u>, 679 F.2d 1323, 1327, n.3 (2d Cir. 1982) (finding no exemption under Rule 147 where Hawaii residents purchased securities from a California limited partnership). The Court concludes that BCDC's sale of securities to New York residents renders the intrastate offering exemption inapplicable.

On a motion for summary judgment, it is the moving party who carries the burden of proof; she must show that no genuine issue of material fact exists, even though at trial her opponent would have the burden of proving the facts alleged. That said, once a plaintiff demonstrates that an issuer has violated the registration provisions of the Act, the burden is on the issuer to show entitlement to an exemption. This Court finds that Defendants, both in opposition to Plaintiff's motion for summary judgment and in support of their own motion for summary judgment, have failed to meet their burden of demonstrating that an exception to the Act's registration requirement applies, or even of raising an issue of material fact concerning the applicability of an exception; therefore, with respect to Plaintiff's Securities Act claim, Plaintiff's motion for summary judgement is granted and Defendant's motion for summary judgement is due to be denied.[24]

### IV. CONCLUSION

Based on the foregoing, the Court finds that Defendants' Motion for Summary Judgment (Doc. No. 11) is due to be DENIED, and Plaintiff's Motion for Summary

---

[24]As the Court finds no exemption from federal law for the BCDC offering, discussion of Plaintiff's state law claim is pretermitted.

Judgment (Doc. No. 14) is due to be GRANTED, the Court finding no genuine issue of material and triable fact as to such claims and that Plaintiff is entitled to judgement as a matter of law.

**IT IS SO ORDERED**, this ___24th___ day of January, 2002.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE